IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 C 11605 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| JEANNE OLSON, not individually but as Trustee of the William Amor Revocable Living Trust, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Scottsdale Insurance Company sued defendants John E. Reid and Associates, Inc. ("Reid"), Michael Masokas (a former Reid employee), and Katelyn Newey (as Special Representative of the Estate of Arthur T. Newey (a former Reid employee)) (collectively, the "Reid Defendants"), and defendant Jeanne Olson (as Trustee of the William Amor Revocable Living Trust), to obtain a declaration that Scottsdale does not have a duty to defend or indemnify any of the defendants in two lawsuits: Olson v. John E. Reid & Associates, Inc., et al., N.D. Ill. Case No. 1:20-cv-01444 ("Federal Lawsuit"); and Olson v. John E. Reid & Associates, Inc., et al., Cir. Ct. Cook Cty., No. 2025L003952 ("State Lawsuit" or "Wrongful Death Lawsuit") (collectively, the "Underlying Lawsuits"). According to Scottsdale's complaint, the Underlying Lawsuits arise from allegations that the Reid Defendants coerced a false confession from William Amor in 1995, which led to his conviction and incarceration in 1997, and eventually his death in 2023.

After Scottsdale filed its complaint, Reid and Masokas assigned their rights against Scottsdale to Olson through a settlement agreement. Scottsdale then agreed to voluntarily

dismiss Reid, Masokas, and Newey from this case with prejudice [Dkt. 10]—leaving Olson as the sole defendant. Olson then answered the complaint and counterclaimed, asserting that Scottsdale breached its duty to defend.

Scottsdale and Olson now cross-move for judgment on the pleadings under Fed. R. Civ. P. 12(c). For the reasons below, the court grants Scottsdale's motion and denies Olson's.

## BACKGROUND

### Scottsdale's Complaint

Scottsdale's complaint alleges the following allegations, which are taken as true for purposes of its Rule 12(c) motion. See Clark v. Blue Diamond Growers, No. 22 C 1591, 2024 WL 730379, at *1 n.1 (N.D. Ill. Feb. 22, 2024). Scottsdale is an Ohio corporation with a principal place of business in (unsurprisingly) Scottsdale, Arizona. The defendants are all Illinois citizens. Scottsdale issued insurance policies to Reid in effect from 2013-2014 and 2018-2024. On September 24, 2025, Scottsdale filed its complaint here to obtain judicial declarations that it has no duty to defend or indemnify any defendant in connection with the Underlying Lawsuits, based on various provisions in the policies.

#### The Underlying Lawsuits

The Underlying Lawsuits generally allege that, on September 10, 1995, William Amor lived in Naperville, Illinois, with his wife and mother-in-law, Marianne Miceli. A fire started at the home, and Miceli—the only one home at the time—died from smoke inhalation. Amor denied setting the fire. But in October 1995, Naperville police officers took him to a Reid facility for polygraph testing and interrogation.

The Reid Defendants are alleged to be liable for conduct that led to Amor eventually falsely confessing—including subjecting him to coercive tactics during an interrogation based on what is known as the "Reid Technique," falsely representing that he failed a polygraph, asking him "misleading and suggestive questions, feeding [him] non-public case information, using minimization techniques to elicit a false confession, denying food and rest, failing to videotape or document interrogations, and falsely claiming multiple examiners scored the polygraph when only one (Masokas) did." The Reid Defendants are also alleged to have withheld and fabricated evidence, and to be liable based on Amor's coerced confession.

In 1997, Amor was convicted of first-degree murder and aggravated arson. But two decades later, his conviction was vacated in 2017, after his confession was found to be scientifically impossible, and he was thereafter acquitted in a bench trial. Amor died in January 2023.

The Underlying Lawsuits generally allege emotional distress, loss of liberty, humiliation, and mental anguish based on his 20 years in prison and his premature death from the harsh prison conditions. As for the Federal Lawsuit, Amor filed it in 2020. But in 2023, after Amor died, Olson was substituted in as plaintiff (as Trustee of the William Amor Revocable Living Trust). A Second Amended Complaint was filed on May 2, 2025, and asserts that the Reid Defendants' alleged misconduct caused: loss of liberty; severe emotional and psychological distress; loss of life experiences; threat of physical harm (incarceration under conditions where Amor feared assault or death); and prolonged psychological torture. The Reid Defendants did not tender the Federal Lawsuit for coverage under any Scottsdale policy.

As for the State Lawsuit, Olson filed it on March 20, 2025. The State Lawsuit alleges that the failures of the Reid Defendants ensured Amor would suffer wrongful imprisonment and exposure to hazardous prison conditions, which caused his death, and seeks compensation for Amor's sister and niece.

Count I asserts a "Wrongful Death/Negligence" claim, alleging that the Reid Defendants owed duties to Amor to: "a. Ensure that only reliable and trustworthy evidence was used against him; b. To intervene to prevent a Naperville law enforcement officers from fabricating evidence, fabricating probable cause, or using false evidence to incarcerate an innocent person; c. To document and disclose exculpatory material to the prosecutors and detectives; and d. To conduct investigations with the goal of finding the truth." But the Reid Defendants allegedly violated these duties by: "failing to conduct an adequate investigation, failing to adequately direct and/or supervise the investigation into the fire, failing to disclose exculpatory evidence in their possession, and failing to intervene to prevent the fabrication and use of false statements during trial."

Count II alleges respondeat superior against Reid—in particular, that "Amor's bodily injuries were the actual, proximate, and foreseeable result of Defendants' misconduct in connection with the investigation of Amor for a crime he did not commit," and that Reid is "legally responsible because these injuries are the foreseeable result of Defendants' policies and procedures and their failure to train and supervise employees."

Scottsdale's Claims in this Case

Count I of Scottsdale's complaint alleges that there is no coverage under "Coverage A" in Scottsdale's "primary policies." According to the complaint, Scottsdale "issued to Reid as the

named insured a commercial general liability insurance policy, No. RBS0015328, which was in effect from December 29, 2018 to December 29, 2019," and which was "renewed" each year thereafter through December 2024. These policies include a "Coverage A" and a "Coverage B."

Scottsdale alleges in Count I that Coverage A "is not triggered by the Underlying Lawsuits" because neither the Federal Lawsuit (which alleges injuries resulting from intentional acts) nor the State Lawsuit (which alleges intentional and knowing conduct) "satisfy 'bodily injury' caused by an 'occurrence' as those terms are defined in the Primary Policies." But even if Coverage A were triggered, "several exclusions preclude coverage." Coverage is also barred, Scottsdale alleges, because the Reid Defendants failed to provide timely notice to Scottsdale. Thus, Scottsdale alleges, it "has no duty to defend the Reid Defendants in the Underlying Lawsuits under Coverage A."

In Count II, Scottsdale alleges that there is also no coverage under Coverage B: The Underlying Lawsuits "allege arrest, imprisonment, and conviction that began decades earlier than the inception of any of the Primary Policies," and neither lawsuit "allege[s] 'personal and advertising injury' caused by an offense committed during the policy periods"; Coverage B includes several exclusions that apply; and the Reid Defendants failed to provide timely notice. Scottsdale alleges that it thus has no duty to defend under Coverage B.

And in Count III, Scottsdale alleges that there is no coverage under certain "excess policies." According to Scottsdale, it issued excess policies to Reid (including one effective from 2013 to 2014, and another effective from 2018 to 2019 (and which was then renewed each year thereafter through 2024)). Scottsdale alleges that these policies "afford excess coverage

only if the underlying" primary policies provide coverage. Because no primary policy covers the Underlying Lawsuits, Scottsdale alleges that there is no coverage under the excess policies.

**Scottsdale Dismisses Reid, Masokas, and Newey**

After Scottsdale filed its complaint, Reid and Masokas assigned their rights against Scottsdale to Olson through a settlement agreement. Scottsdale thereafter agreed to voluntarily dismiss Reid, Masokas, and Newey from this case with prejudice [10].

**Olson Answers and Counterclaims**

In December 2025, Olson—the only defendant left—filed an Answer and Counterclaims with three counts. Scottsdale thereafter moved to dismiss Counterclaim Count III. But Olson filed "First Amended Counterclaims," in which she dropped Counterclaim Count III, and this court therefore denied as moot Scottsdale's motion [37].

The operative counterclaims assert the following allegations, which again are taken as true for purposes of its Rule 12(c) motion. The Reid Defendants tendered the State Lawsuit to Scottsdale, but Scottsdale "refused to defend or indemnify the Reid Defendants in connection therewith." On August 14, 2025, "the Reid Defendants and Olson reached a settlement in principle of the Wrongful Death Lawsuit, which was later reduced to writing in a Settlement Agreement," under which the Reid Defendants agreed to pay Olson $2 million. Because two other insurers have already paid $200,000 of that amount, Olson agreed to satisfy the remaining $1.8 million "via an assignment of rights against" Scottsdale, and to dismiss the State Lawsuit. A petition to approve the settlement has been approved in the State Lawsuit. Olson further agreed to dismiss the then-pending Federal Lawsuit, which was dismissed in September 2025.

In Counterclaim Count I, Olson asserts a "breach of contract" claim against Scottsdale, alleging that Scottsdale breached its duty to defend Reid under the primary and excess policies. As a result, Olson alleges, Reid was damaged "because it had to enter the Settlement Agreement and assign rights to Olson to avoid excess exposure." Olson thus seeks judgment in her favor and $1.8 million in damages. In Counterclaim Count II, Olson asserts a "declaratory judgment" claim seeking a declaration that Scottsdale "owed and breached its duty to defend" and that Scottsdale must pay the remaining $1.8 million.

**Scottsdale Answers the Counterclaims and the Parties file Rule 12(c) Motions**

Scottsdale answered the counterclaims, and shortly thereafter, filed a Rule 12(c) motion, asking the court: to declare that it had no duty to defend the Reid Defendants in connection with the Underlying Lawsuits; to declare that it had no duty to indemnify Olson (individually and as assignee of the Reid Defendants) in connection with the Underlying Lawsuits; and to dismiss Olson's Counterclaims. In response, Olson filed a "cross-motion for partial judgment on the pleadings" under Rule 12(c), asking the court: to deny Scottsdale's motion; to declare that Scottsdale breached its duty to defend Reid in connection with the State Lawsuit under policy no. "RBS0086353 effective 12/29/2022-12/29/2023";[1] and to declare that Scottsdale breached its duty to defend Masokas and Newey in connection with the State Lawsuit under that same policy.

[1] The policy that Olson attaches to her opening brief and argues that she is relying on appears to actually be policy no. RBS0183049 (which was the renewal of policy no. RBS0086353).

## DISCUSSION

### Rule 12(c) and the "Duty to Defend" Legal Framework

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same." Federated Mutual Ins. Co. v. Coyle Mech. Supply Inc., 983 F.3d 307, 313 (7th Cir. 2020).

Although the standard is the same, "when the movant seeks to dispose of the case on the basis of the underlying substantive merits the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." Admiral Ins. Co. v. Anderson, 529 F. Supp. 3d 804, 810 (N.D. Ill. 2021) (cleaned up). To that end, "the moving party must demonstrate that there are no material issues of fact to be resolved," Federated Mutual, 983 F.3d at 313 (citation omitted), and the pleadings include the complaint, the answer, and documents attached to the pleadings, documents that are critical to them and referred to in them, and information that is subject to proper judicial notice, see id.; see also Kuebler v. Vectren Corp., 13 F.4th 631, 636 (7th Cir. 2021).

The interpretation of an insurance policy and whether an insurer has duty to defend are questions of state law that may be resolved summarily, including on a Rule 12(c) motion. See Title Indus. Assurance Co., R.R.G. v. First Am. Title Ins. Co., 853 F.3d 876, 883 (7th Cir. 2017); Roman Cath. Diocese of Springfield in Ill. v. Maryland Cas. Co., 139 F.3d 561, 565 (7th Cir. 1998). Because both parties here agree that Illinois law applies, the court will apply Illinois law. See Nationwide Ins. Co. v. Cent. Laborers' Pension Fund, 704 F.3d 522, 525 (7th Cir. 2013)

(applying Illinois law where "[t]he parties agree that the substantive law of Illinois governs this diversity action").

Under Illinois law, "[i]n determining whether [an insurer] has a duty to defend," the court considers "the allegations in the state complaint in concert with the provisions of the Policy." Id. In doing so, the court "begin[s] with the deck stacked in favor of the insured." Del Monte Fresh Produce N.A., Inc. v. Transportation Ins. Co., 500 F.3d 640, 643 (7th Cir. 2007). That is because "courts liberally construe both the terms of an insurance policy and the allegations in the underlying complaint in favor of the insured." Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co., 796 F.3d 717, 723 (7th Cir. 2015). "If the underlying complaint alleges facts within or potentially within policy coverage," the court "will find a duty to defend." Nationwide, 704 F.3d at 525 (emphasis added) (cleaned up). And "if the underlying complaint alleges several theories of recovery," the court will find a duty to defend "even if only one such theory is within the potential coverage of the policy." Title Indus., 853 F.3d at 884 (cleaned up).

Of course, if "the relevant policy language is clear and unambiguous, it must be given its plain and ordinary meaning." Nationwide, 704 F.3d at 525. On this score, an "insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." Westfield Ins. Co. v. Vandenberg, 796 F.3d 773, 777 (7th Cir. 2015) (quoting Hobbs v. Hartford Ins. Co. of the Midwest, 823 N.E.2d 561, 564 (2005)). "When interpreting an insurance policy," the court's "primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." Id. at 777-78 (cleaned up). To achieve that objective, the court construes "the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks

undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." Id. at 778. But in all events, in a duty to defend analysis, "all doubts and ambiguities must be resolved in favor of the insured." Nationwide, 704 F.3d at 525 (cleaned up).

Still, "the burden is on the insured to prove that its claim falls within the coverage of an insurance policy." Artisan & Truckers Cas. Co. v. Hanover Ins. Co., 126 F. Supp. 3d 998, 1001 (N.D. Ill. 2015) (citation omitted). If it does so, "the burden then shifts to the insurer to prove that a limitation or exclusion applies." Id. (citation omitted); see Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co., 611 F.3d 339, 347 (7th Cir. 2010) ("Insurers have the burden of proving that an exclusion applies."). To meet that burden, the insurer must show that it is "'clear and free from doubt' that the exclusion applies." Santa's Best Craft, 611 F.3d at 348 (citations omitted).

Finally, because the "duty to indemnify is narrower than the duty to defend," if there is no duty to defend, there is no duty to indemnify. Travelers Com. Ins. Co. v. Hansen, No. 24 CV 13006, 2026 WL 2150040, at *4 (N.D. Ill. July 27, 2026) (cleaned up).

**The Parties' Competing Arguments**

In its opening brief, Scottsdale argues that it has no duty to defend in connection with the Underlying Lawsuits. First, it asserts, a "Testing or Consulting Exclusion"—which excludes a "bodily injury" arising out of any error, omission, defect or deficiency in any test or consultation given—"precludes all coverage" under both Coverage A and B "since the entirety of the Reid Defendants' liability is for their errors, omissions, defects, and deficiencies in their interrogation tests and polygraph examinations." Second, "Exclusion o."—which excludes a "'Bodily injury'

arising out of 'personal and advertising injury'"—bars coverage under Coverage A because "Amor's claims arise out of his malicious prosecution and false imprisonment," which fall under the definition of a "personal and advertising injury." And third, Coverage B does not apply "because all alleged 'personal and advertising injury,' i.e., malicious prosecution, occurred more than two decades prior to the inception of the Scottsdale Policies."

In response, Olson asserts that she does not contend that Scottsdale had any duty to defend the Federal Lawsuit. That is because, she says, that action sought damages for Amor's incarceration ending in 2017—"well before the inception of the first . . . primary policy issued on December 29, 2018." So, Olson contends, the issue here is narrow—whether Scottsdale breached its duty to defend the Reid Defendants in connection with the State Lawsuit under the primary policy that was in effect from 2022 to 2023. According to Olson, "[t]hat single primary 2022–2023 Policy—together with a follow-form excess policy issued by Scottsdale for the same policy period—provide $2 million in per-occurrence limits, which is sufficient to satisfy the remaining" $1.8 million due.

As for that 2022-2023 primary policy [hereinafter, the "Relevant Policy"], Olson agrees with Scottsdale that the State Lawsuit complaint falls outside "Coverage B for 'personal and advertising injury,'" but she asserts that it at least potentially falls within Coverage A, and that Scottsdale did not argue otherwise in its brief. And as for the two exclusions Scottsdale relies on—the Testing or Consulting Exclusion and Exclusion o.—Olson contends that Scottsdale has not met its burden to show that either applies here.

Scottsdale counters in reply that Olson is wrong about the two exclusions. It then makes an "alternative" argument: Olson is not entitled to judgment on the pleadings because there is a factual dispute over whether the Reid Defendants timely notified Scottsdale of Amor's claims.

Finally, in her reply, Olson reiterates that Scottsdale's exclusions-arguments fail, and also asserts that Scottsdale's "late notice argument" is "meritless and too late": "The insured provided notice the same day" that the State Lawsuit was filed, and Scottsdale—"after sitting on that notice through active settlement proceedings"—is estopped from invoking a late-notice defense.

**The Court Grants Judgment in Scottsdale's favor on the Conceded Issues**

Because Olson states that she does not contend that Scottsdale had any duty to defend the Federal Lawsuit, and because Olson agrees with Scottsdale that the State Lawsuit complaint does not fall within "Coverage B for 'personal and advertising injury,'" the court grants judgment in favor of Scottsdale on those issues. See Harrison v. Illinois Cent. R. Co., No. 08-748-DRH, 2009 WL 1515180, at *3 (S.D. Ill. May 28, 2009) (granting the defendant's Rule 12(c) motion "because [the] Plaintiff concedes that the allegations in paragraph 8 cannot succeed").

**Whether Scottsdale had a Duty to Defend in the State Lawsuit Based on Coverage A**

Turning to the disputed issues, Olson argues that Scottsdale breached its duty to defend the Reid Defendants in connection with the State Lawsuit under the Relevant Policy, and Scottsdale argues that two exclusions preclude any coverage.

Whether the State Lawsuit Potentially Falls within the Relevant Policy's Coverage A

As explained above, Olson bears the burden to show that the Reid Defendants' claims fall within Coverage A. See Artisan, 126 F. Supp. 3d at 1001. Olson contends that she has met her

burden here by showing that the State Lawsuit complaint alleges facts within or at least potentially within Coverage A. The court agrees.

For starters, Scottsdale failed to address this issue. It has thus waived any argument that the claims fall outside Coverage A. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). But any such argument would fail anyway: Olson has also shown that the claims potentially fall within Coverage A.

Coverage A provides in relevant part:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.
>
> The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.
>
> Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.
>
> **SECTION I – COVERAGES**
>
> **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1. Insuring Agreement**
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> (2) The "bodily injury" or "property damage" occurs during the policy period; . . . .

> e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

The Relevant Policy thus provides: (1) that Scottsdale "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies" and "will have the . . . duty to defend the insured against any 'suit' seeking those damages"; (2) that the "bodily injury" (which "Section V" defines as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time") must have "occur[ed] during the policy period"; and (3) that the "bodily injury" must have been "caused by an 'occurrence'" (which Section V defines as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions").

Here, both parties agree that the Reid Defendants are "insureds." As for Reid, it was the Named Insured; as for Masokas and Newey, they were Reid employees, and thus qualify as "insureds" under "Section II.2.a" of the policy.

The State Lawsuit also alleges a "bodily injury" that occurred during the policy period. It states that Olson filed the complaint on behalf Amor's sister and niece against the Reid Defendants seeking damages for Amor's exposure to harmful prison conditions from 1997 to 2017, which ultimately resulted in his death in January 2023. Amor's death meets the definition of "bodily injury," and the death occurred during the 2022-2023 policy period. Coverage A at I.1.E., moreover, explains that "Damages because of 'bodily injury' include damages 'claimed by any person . . . for care, loss of services or death resulting at any time from the 'bodily injury,'" and here, Amor's sister and niece seek damages for "grief, sorrow, and mental

suffering, and suffered a loss of love, society, affection, direction and training" as a result of Amor's death.

Finally, Amor's death was also at least potentially "caused by an 'occurrence'"—again, defined in the Policy as an "accident." Illinois courts generally define "occurrence" the same way. And they determine "whether an occurrence has occurred . . . from the insured's standpoint," and based on the factual allegations of the underlying complaint. Illinois Farmers Ins. Co. v. Kure, 364 Ill. App. 3d 395, 401-02 (3d Dist. 2006). In doing so, they consider "whether the injury was expected or intended." Admiral, 529 F. Supp. 3d at 815 (citation omitted). As the Kure court explained: "If an act is performed with the intention of accomplishing a certain result, and if, in the attempt to accomplish that result, another result, unintended and unexpected, and not the rational and probable consequence of the intended act, in fact, occurs, such unintended result is deemed to be caused by accidental means." 364 Ill. App. 3d at 402 (cleaned up).

The State Lawsuit alleges that the Reid Defendants intentionally acted by, for example, using "mentally, abusive, and coercive tactics while Amor was held at the Reid" facility in 1995. But it would be difficult to conclude that (at least from their standpoint) the Reid Defendants would have expected, or intended for, these acts to ultimately result in his death decades later in 2023. Even if that were not so, though, the State Lawsuit also alleges that the Reid Defendants negligently violated their "duties of care by failing to conduct an adequate investigation, failing to adequately direct and/or supervise the investigation into the fire, failing to disclose exculpatory evidence in their possession, and failing to intervene to prevent the fabrication and use of false statements during trial." See Admiral, 529 F. Supp. 3d at 815 (rejecting insurer's

argument that "allegations that defendants intentionally hazed" a sorority sister who later committed suicide showed that her death was not caused by an "occurrence," because there were other allegations of negligence based on the defendants' alleged failures to act). And as for Reid, the State Lawsuit alleges that Reid failed to train and supervise employees and is liable based on respondeat superior. The court thus finds that the Reid Defendants at least potentially would not have expected or intended Amor's death, and therefore Amor's death was at least potentially a "bodily injury" caused by an "accident."

In short, Olson has met her burden to show that the Reid Defendants' claims potentially fall within Coverage A.

Whether an Exclusion Bars Coverage

The burden accordingly shifts to Scottsdale to show that it is "clear and free from doubt" that at least one of the two exclusions on which it relies bars coverage. Santa's Best Craft, 611 F.3d at 348 (citations omitted).

Whether the Testing or Consulting Exclusion Bars Coverage

The Testing or Consulting Exclusion provides:

> The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**
>
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
>
> **1.** An error, omission, defect or deficiency in:
>
> **a.** Any test performed; or
>
> **b.** An evaluation, a consultation or advice given;
>
> by or on behalf of any insured;
>
> **2.** The reporting of or reliance upon any such test, evaluation, consultation or advice; or
>
> **3.** An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph **1., 2.** or **3.**

Scottsdale asserts that the State Lawsuit's allegations "fall squarely within" the exclusion. According to Scottsdale, the State Lawsuit alleges that the Reid Defendants "used a proprietary interrogation technique, which included a false representation that Amor had failed a polygraph, misleading and suggestive questions, feeding Amor non-public case information, and using minimization techniques to elicit a false confession." Each alleged "wrongful act," Scottsdale contends, "neatly fit[s] within the" exclusion. And, Scottsdale continues, "the Reid Defendant's alleged failure to provide exculpatory statements by Amor obtained during the interrogation would fall within the Exclusion's subpart 2." Because "it is the Reid Defendants' professional interrogation methods that allegedly" led to Amor's arrest, wrongful incarceration, and death, Scottsdale concludes that "the harm allegedly suffered by Amor necessarily arises out of the Reid Defendants' testing, evaluation, consultation, and reporting."

Olson argues in response that Scottsdale is effectively reading out "error, omission, defect or deficiency," in an effort to "transform[ ] the endorsement into a sweeping professional-services exclusion." And subpart 2, Olson continues, is limited because it refers to the "reporting of or reliance upon any ***such*** test, evaluation, consultation or advice," which "necessarily refers" back to the defective test or consultation. (Emphasis by Olson). Ultimately, Olson presses, the State Lawsuit "alleges coercion, concealment of exculpatory evidence, failures to intervene in abuse, and broader institutional negligence—conduct that is not reasonably characterized as a mere testing or consulting 'error.'"

The court finds that Scottsdale has failed to establish that it is clear and free from doubt that the Testing and Consulting Exclusion applies. When an underlying complaint presents multiple theories of recovery, the presence of "at least one theory" that falls outside the relevant

exclusion is enough to trigger the insurer's duty to defend. Title Indus., 853 F.3d at 890 (finding that an exclusion for any claim relating to "any dishonest, fraudulent, criminal, malicious or intentional wrongful acts committed by or at the direction of the Insured" did not apply where "at least one theory" fell outside of the exclusion); see also id. at 887 ("Most of the allegations in the tendered complaints had no obvious relationship to a fraud claim, though just one path toward a covered claim would have been enough to trigger the duty to defend." (emphasis added)). That is the case here.

The State Lawsuit complaint broadly asserts in its "facts" section that Masokas and Newey "participated in" a variety of "conduct . . . which . . . ultimately led Amor to falsely confess to setting the fire." To be sure, some of that alleged conduct might arguably fall within the exclusion—for example, that Masokas and Newey "[i]mproperly g[ave] Amor suggestions in order to impact subsequent polygraph results." That could potentially be considered an error or defect in a test the Reid Defendants performed. But other conduct plausibly falls outside the exclusion—for example: "[u]tilizing . . . mentally, abusive, and coercive tactics" and "[d]epriving Amor of food or drink for hours." These actions cannot reasonably be characterized as mere "error, omission, defect or deficiency" in giving a test or evaluation. See Airport Concession Consulting Servs., LLC v. Sentinel Ins. Co., Ltd, No. 3:17-CV-01666-HZ-1, 2018 WL 2729199, at *7 (D. Or. June 6, 2018) (finding that the allegations in underlying lawsuit did not "entirely fall" within Testing and Consulting exclusion, explaining that "the words 'error,' 'omission,' 'defect,' and 'deficiency' indicate that the exclusion applies to negligent or mistaken conduct in the course of a test performed or advice or consultation given," and that the

allegations "clearly implicated intentional misconduct in the course of the consulting work that Plaintiffs performed").

Count I of the State Lawsuit—in which Olson asserts a "Wrongful Death/Negligence" claim—further alleges conduct that also plausibly falls outside the exclusion. It alleges that the Reid Defendants "owed" Amor a duty: "a. To ensure that only reliable and trustworthy evidence was used against him; b. To intervene to prevent a Naperville law enforcement officers from fabricating evidence, fabricating probable cause, or using false evidence to incarcerate an innocent person; c. To document and disclose exculpatory material to the prosecutors and detectives; and d. To conduct investigations with the goal of finding the truth." Yet they allegedly "violated these duties of care by failing to conduct an adequate investigation, failing to adequately direct and/or supervise the investigation into the fire, failing to disclose exculpatory evidence in their possession, and failing to intervene to prevent the fabrication and use of false statements during trial." This misconduct, Count I alleges, resulted in Amor suffering exposure to harsh prison conditions, which led to his death.

At least the last allegation—failing to intervene to prevent the police from fabricating and using false statements during trial—presents a theory under which Amor's death did not arise out of an error or defect in any test. To illustrate the point: assume that the Reid Defendants flawlessly conducted a polygraph test, but they also failed to intervene to prevent the police from fabricating evidence and coercing false statements from Amor. Amor's death would not have in any sense arisen out of an error or defect in the Reid Defendants' testing and consulting.

In sum, because the State Lawsuit presents one or more allegations or theories that fall outside of the exclusion, Scottsdale was not excused from its duty to defend. The fact is, if

Scottsdale had wanted to broadly exclude from coverage bodily injuries that related in any way to Reid's investigative or interrogative services, it could have written the exclusion to expressly say so. The court thus finds that Scottsdale has not shown that it is clear and free from doubt that the Testing and Consulting exclusion applies to preclude coverage.

Whether Exclusion o. Bars Coverage

Exclusion o. and Section V provide in relevant part:

> **2. Exclusions**
>
> This insurance does not apply to: . . . .
>
> **o. Personal And Advertising Injury**
>
> "Bodily injury" arising out of "personal and advertising injury". . . .
>
> **SECTION V – DEFINITIONS** . . . .
>
> **14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> **a.** False arrest, detention or imprisonment;
>
> **b.** Malicious prosecution; . . . .

Scottsdale asserts that this exclusion applies because the State Lawsuit "arise[s] entirely out of the Reid Defendants' coercion of Amor in causing him to make a false confession, and then subsequent failure to disclose exculpatory statements made by Amor during his interrogation, which then resulted in his decades-long wrongful incarceration." The State Lawsuit allegations, Scottsdale asserts, are thus "fully encompassed" by the "'personal and advertising injury' offense of 'malicious prosecution.'"

In response, Olson contends that the exclusion does not apply because the State Lawsuit "did not assert claims for malicious prosecution or false imprisonment," and the allegations do not "establish" those offenses. Olson argues that there are no allegations that "the Reid

Defendants 'commenced or continued any judicial proceeding' against Amor, much less that they did so 'without probable cause' or otherwise 'acted with malice'"—which make up three of the elements of a malicious prosecution claim under Illinois law. Nor, Olson argues, does the State Lawsuit allege that "the Reid Defendants restrained or arrested" Amor "without probable cause" as required to state a false imprisonment claim. And, Olson continues, Amor's "death resulted from wrongful incarceration—not unlawful pretrial detention."

Scottsdale argues in reply that "it is immaterial that Olson did not plead a malicious prosecution or false imprisonment" claim. That is because, it asserts, the term "arising out of" in the context of an exclusion "presents a 'but-for' inquiry," (quoting Zurich Am. Ins. Co. v. Ocwen Fin. Corp., 990 F.3d 1073, 1079 (7th Cir. 2021)), and here, "Amor would not have been injured due to his incarceration but for the Reid Defendants' failures to 'conduct an adequate investigation,' 'adequately direct and/or supervise the investigation,' 'disclose exculpatory evidence,' and 'intervene to prevent the fabrication and use of false statements during trial.'" Scottsdale also argues that there is no language in Exclusion o. that requires the insureds (the Reid Defendants) to have committed the "personal and advertising injury" for the exclusion to apply. Finally, Scottsdale contends that the elements of the specific torts need not be met: what matters is "whether the insured committed malicious prosecution or false imprisonment in accordance with the common, popular understanding of the terms." (Citing Sanders v. Illinois Union Ins. Co., 2019 IL 124565, ¶ 29). Because "Olson seeks to recover against the Reid Defendants for what is essentially a claim of false arrest or detention and a claim for malicious prosecution, irrespective of who committed the offense," Scottsdale concludes that Exclusion o. applies.

The court agrees with Scottsdale, and finds that Scottsdale has shown that it is "clear and free from doubt" that the Exclusion o. applies to preclude coverage. Putting together the relevant language from Exclusion o. and the definition of "personal and advertising injury," the exclusion precludes coverage of claims against the insured for damages based on a death "arising out of" the "offense" of either "false arrest, detention or imprisonment" or "malicious prosecution."

The court first finds that, as used in the policy, the word "offense" refers to "the wrongful conduct underlying" the recited torts. Sanders, 2019 IL 124565, ¶ 27 ("conclud[ing] that the word offense in the insurance policy refers to the wrongful conduct underlying the malicious prosecution"). Olson argues that, for the exclusion to apply, the State Lawsuit needed to have asserted allegations that establish each and every element of the underlying torts as defined by Illinois law. But she cites no case law in support of that proposition, and she has identified no language in the policy to suggest that the parties intended to "limit the meaning of 'offense' by requiring the completion of tort law elements." Id. at ¶ 26 (cleaned up). And "courts have found that," for example, "the 'personal injury' of 'malicious prosecution' in the context of an insurance policy differs from the common-law elements of the tort of malicious prosecution." Id. at ¶ 27 (cleaned up). Because "the language of the policy does not require that the elements of the tort be satisfied," the court "cannot read into it the requirements of a tort claim for malicious prosecution" or false imprisonment. Id. at ¶ 29.

So the court must look to what the wrongful conduct underlying those torts is. The wrongful conduct underlying "false arrest, detention or imprisonment" is the unlawful detention of a person or the detention of a person without legal process. See Wallace v. Kato, 549 U.S.

384, 388-89 (2007) (explaining that "false arrest and false imprisonment overlap; the former is a species of the latter," and that the "unlawful detention remediable by the tort of false imprisonment is detention without legal process" (emphasis removed)); Poris v. Lake Holiday Prop. Owners Ass'n, 2013 IL 113907, ¶ 61 ("False imprisonment is the unreasonable restraint of an individual's liberty, against his will, caused or procured by the defendant."). "Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process," and "[t]hereafter, unlawful detention forms part of the damages for the entirely distinct tort of malicious prosecution." Wallace, 549 U.S. at 389-90 (cleaned up) (emphasis removed). The wrongful conduct underlying malicious prosecution is the knowingly bringing of a groundless suit or a suit without probable cause. See Sanders, 2019 IL 124565, ¶ 27 (explaining that the "gist of the action for malicious prosecution is, that the prosecutor acted without probable cause" or "the bringing of a suit known to be groundless" (citations omitted)).

The question here, then, is whether the State Lawsuit complaint alleges that Amor's death arose out of one or both of an unlawful detention of Amor (false imprisonment) or a knowingly bringing of a groundless suit against Amor (malicious prosecution). As Scottsdale correctly notes, "the 'arising out of' phrase presents a 'but-for' inquiry." Zurich, 990 F.3d at 1079. This means here that, if Amor "would not have been injured but for the" conduct underlying false imprisonment or malicious prosecution, "then the exclusion applies to all claims flowing from that underlying conduct regardless of the legal theory used." Id. (emphasis removed) (citing G.M. Sign, Inc. v. State Farm Fire & Cas. Co., 2014 IL App (2d) 130593, ¶ 28 ("'Arising out of' means 'originating from,' 'having its origin in,' 'growing out of,' and 'flowing from.'")).

With Exclusion o.'s language properly construed, the court looks next to the State Lawsuit complaint. In doing so, the court "focus[es] on the pleaded facts, not on the labels attached to those facts." Zurich, 990 F.3d at 1080. The State Lawsuit complaint alleges that:

- Masokas and Newey "met with the officers," and "[d]espite the lack of any credible information suggesting that Amor was involved in setting the fire, the officers and [Masokas and Newey] targeted him."
- Masokas and Newey "participated in" conduct—including using "mentally, abusive, and coercive tactics," depriving Amor food and drink, and making false statements—"that ultimately led Amor to falsely confess to setting the fire."
- Masokas and Newey "were also aware that the officers were threatening and abusing Amor in attempt to extract inculpatory statements from him."
- "Based on Amor's 'confession,'" Amor was charged with first-degree murder and aggravated arson and denied bond.
- The Reid Defendants "fail[ed] to conduct an adequate investigation, fail[ed] to adequately direct and/or supervise the investigation into the fire, fail[ed] to disclose exculpatory evidence in their possession, and fail[ed] to intervene to prevent the fabrication and use of false statements during trial."
- "At Amor's trial, the key evidence connecting Amor to the offense was the fabricated statements and confession attributed to Amor by [Masokas and Newey]."
- "[F]ollowing a trial, Amor was convicted of both aggravated arson and first-degree murder."
- The Circuit Court of DuPage County later vacated Amor's convictions, explaining that "[t]here can be no question that the lynchpin of the State's case at trial was the defendant's confession, which the State and Defense experts today agree is scientifically impossible."
- Masokas and Newey's conduct "ensured that Amor would suffer wrongful imprisonment and exposure to hazardous prison conditions from 1997 through 2017."
- Olson thus "seeks damages for [Amor's] exposure to harmful prison conditions from 1997 through 2017, resulting in severe and traumatic bodily injuries, the contraction of diseases and chronic health issues, and ultimately" his untimely death in January 2023—"bodily injuries [which] were the actual, proximate, and foreseeable result of Defendants' misconduct in connection with the investigation of Amor for a crime he did not commit."

The State Lawsuit complaint thus makes clear that Amor would not have been injured but for the conduct that underlies a malicious prosecution against him—that is, the knowingly bringing of a groundless suit against him.[2] As a result, Exclusion o. applies to all of Olson's claims in the State Lawsuit—regardless of the legal theories recited. Zurich, 990 F.3d at 1079.

Nor does it matter here that the Reid Defendants were not the entities that actually prosecuted Amor. For one thing, there is nothing in Exclusion o. that requires that the insured have committed the "personal and advertising injury." Exclusion o. therefore applies even though the prosecutor ultimately brought the prosecution. Cf. Ricchio v. Bijal, Inc., 424 F. Supp. 3d 182, 189-92 (D. Mass. 2019) (finding that Exclusion o. excluded coverage in connection with plaintiff's underlying claims against insured hotel under the Victims of Trafficking and Violence Protection Act, even though plaintiff's injuries allegedly arose out of her "false imprisonment" at the hotel by a third-party not covered by the policy). For another thing, Illinois courts have explained that "prosecutors ordinarily rely on police and other agencies to investigate criminal acts," and "that liability for malicious prosecution" thus "extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present." Beaman, 2019 IL 122654, ¶ 43 (citation omitted).

[2] The allegations also readily map onto the elements of a malicious-prosecution claim under Illinois law: "(1) the commencement or continuance of an original, criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff, who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to the plaintiff." Beaman v. Freesmeyer, 2019 IL 122654, ¶ 38 (citation omitted); see also id. at ¶ 40 (explaining that the first two elements have over time been "collapsed" into one).

The State Lawsuit complaint's allegations make clear that the officers and the Reid Defendants played a significant role in causing Amor's prosecution.

Finally, the court notes that the Title Indus. issue that sunk Scottsdale's reliance on the Testing and Consulting exclusion does not similarly sink Scottsdale's reliance on Exclusion o. That is because all of the alleged conduct—whether intentional, negligent, or supervisory—is asserted to have caused Amor to be maliciously prosecuted, which ultimately led to his injury (death). So unlike with the Testing and Consulting exclusion, the State Lawsuit allegations all fall within Exclusion o. See Title Indus., 853 F.3d at 889 n.6 (collecting Illinois cases in which courts found no coverage where "the gravamen of the underlying claim was an excluded injury" and in which those "courts refused to allow claimants and insureds to avoid unambiguous exclusions with artful labeling"); Westfield, 796 F.3d at 781 (exclusion for "bodily injury" "arising out of" the use of a rented watercraft precluded coverage of a complaint alleging claimant was injured on a rented boat despite the complaint also alleging that "the negligent maintenance" of a bench on the boat over which claimant fell "was a concurrent cause of his injuries," explaining that "the presence of an alternative theory of relief is insufficient to trigger coverage when the plaintiff does not allege an injury independent of the injury sustained as a result of the excluded liability" (cleaned up)); Scottsdale Ins. Co. v. Sheppard, No. 1:18-CV-1406, 2019 WL 2716759, at *3 (C.D. Ill. June 28, 2019) ("Section 2 of the Assault and/or Battery Exclusion plainly and clearly excludes coverage for the second claim against [the defendant], the gravamen of which is that [the defendant] negligently failed to prevent the alleged assault/battery.").

In brief, Exclusion o. "plainly and clearly precludes coverage" for the underlying State Lawsuit claims against the Reid Defendants. Sheppard, 2019 WL 2716759, at *3. Because it is clear and free from doubt that Exclusion o. precludes coverage, Scottsdale did not have a duty to defend the Reid Defendants. Consequently, Scottsdale also had no duty to indemnify the Reid Defendants, Travelers, 2026 WL 2150040, at *4 ("where there is no duty to defend there cannot arise a duty to indemnify" (citation omitted)), and the court need not proceed to addressing the parties' arguments about whether notice was late or whether Scottsdale is estopped from asserting late notice as a defense.

**CONCLUSION**

For the above reasons, the court grants Scottsdale's motion for judgment on the pleadings [29] and denies Olson's cross-motion for judgment on the pleadings [33]. The parties are directed to submit a joint status report by October 6, 2026, explaining whether any issue is left in this case.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: September 22, 2026**